UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

EDWARD TROTTER                    CIVIL ACTION NO. 07-cv-2088

VERSUS                            JUDGE STAGG

WARDEN LOUISIANA STATE            MAGISTRATE JUDGE HORNSBY
PENITENTIARY

## REPORT AND RECOMMENDATION

### Introduction

A Caddo Parish jury convicted Edward Ray Trotter, Jr. ("Petitioner") of Possession of a Schedule II CDS (cocaine) between 28 and 200 grams. He was then adjudicated a third-felony habitual offender and received an enhanced sentence of life imprisonment without benefits. His conviction was affirmed on direct appeal. State v. Trotter, 852 So.2d 1247 (La. App. 2d Cir. 2003), writ denied, 867 So.2d 689 (La. 2004) and 870 So.2d 282 (La. 2004). Petitioner later filed an application for post-conviction relief, which the state courts denied on the merits. Petitioner now seeks federal habeas corpus relief on several grounds. It is recommended, for the reasons that follow, that the petition be granted.

### Background Facts

A narcotics task force placed Petitioner under surveillance after a confidential informant (CI) gave a tip that someone was selling drugs on Midway Street in Shreveport. The task force had the CI make two controlled buys from Petitioner at Petitioner's residence

on October 7, 1999.  The task force then obtained a search warrant for the residence, which they arrived to execute at about 6:00 p.m. on October 8, 1999.

As the officers arrived to execute the warrant, they saw Petitioner leave the residence in a vehicle with another man, a woman, and a baby.  Officers in a patrol unit followed the vehicle and made a traffic stop.  A search of the vehicle found 4.4 grams of crack cocaine in the baby's diaper.

Petitioner was arrested and returned to his residence, where the task force was executing the search warrant.  Several female children, between 12 and 16 years old, were at the house.  Petitioner's girlfriend, Alicia Tucker, arrived home from work while the search was in progress.  The officers discovered 58 grams of crack cocaine in a hallway attic. Petitioner admitted that the drugs were his.  Police also recovered unused baggies and cash, including $240 in buy money from the CI purchases.

At trial, the defense presented testimony from Kenneth Pennington, Petitioner's cousin, a convicted felon who was serving time for armed robbery.  Pennington asserted that the crack cocaine found in the attic of the house belonged to him.  The jury was not persuaded, and it returned a conviction.

**Batson Challenges**

**A. State Court Proceedings**

Petitioner offers a one-paragraph argument in his habeas memorandum that the trial court violated his constitutional rights protected by Batson v. Kentucky, 106 S.Ct. 1712

(1986) when it did not reinstate certain black jurors struck by the prosecution.  Petitioner, as he did in his state court direct-appeal brief, merely states the claim and refers to the argument his trial counsel made in a motion for new trial found at Tr. 77-82.

A Batson claim of racial discrimination in jury selection is analyzed in a three-step process.  First, the defendant must make a prima facie showing that the prosecution has exercised peremptory challenges on the basis of race.  Second, if a prima facie showing is made, the burden shifts to the prosecution to articulate a race-neutral reason for the peremptory challenge. Third, the trial court must determine whether the defendant has proved purposeful discrimination.  Batson, 106 S.Ct. at 1712; Price v. Cain, 560 F.3d 284, 286 (5th Cir. 2009).

At the end of jury selection, defense counsel Loyd Thomas made a Batson challenge with the observation that the State had used nine of its ten peremptory challenges to strike black jurors.  Prosecutor Edward Brossette stated that three blacks had not been struck, and he pointed out that defense counsel used all 12 of his challenges to strike white jurors.  Trial judge Charles Scott stated that he had already indicated to counsel that if a challenge were made "that I had a sufficient basis that I would be mandated under the law to require a race neutral explanation" for the challenges.  This implies a finding of a prima facie case.

The judge then went down the list of prospective jurors challenged by the State and Petitioner, and he called on the striking counsel to provide a race neutral explanation for each challenge.  He found some of the explanations satisfactory, but he overruled other challenges.

The defense's strikes of prospective jurors Willis, Snider, and Holly were overruled, and those white persons were ordered returned to the venire.  The prosecution's strikes of prospective jurors Black and Demming were overruled, and those black persons were ordered returned to the venire.  Tr. 292-307.

Two of the white prospective jurors - Willis and Snider - had been stricken early in the day and allowed to go home.  The judge proposed to complete the panel with other prospective jurors who were available at the courthouse.  The prosecutor objected and pursued an emergency writ application.  Tr. 307-11 and 58A.  The state appellate court granted the writ with the explanation that the proper remedy was to recess the trial until the improperly struck jurors could be returned to the courthouse for jury service.  Tr. 70.

The trial proceeded to the guilty verdict.  Defense counsel then ordered a transcript of the voir dire (Tr. 74) and filed a motion for new trial in which he argued that a close examination of the transcript showed that the prosecutor's reasons for striking black jurors were not supported and that the prosecutor did not strike white jurors who gave similar answers.  Petitioner's memorandum discussed the State's strikes of black prospective jurors Sudds, James, Taylor, and Black.  The strike of juror Black, however, had been overruled by the trial court, and she had been returned to the venire. (Ms. Black eventually served as the alternate on the trial jury. Tr. 62 and 318.) The trial court summarily denied the motion, citing the discussions of the issue at trial.  Tr. 457.

The final reasoned state-court decision on this issue came from the state appellate court, which addressed Petitioner's challenge to the finding that race neutral reasons were given for the challenges to prospective jurors Sudds, James, and Taylor.  Petitioner's direct appeal brief, like his habeas petition, directed only a paragraph to the <u>Batson</u> claim, referring the court to the motion for new trial filed in the trial court.  Tr. 517.

The State had explained to the trial judge that it struck these three prospective jurors because of their views that drug use was a "personal choice."  Petitioner argued that white jurors Ratley and Connell gave the same answers but were not challenged by the State.  The state appellate court held:  "A review of the record indicates that jurors, Sudds and Taylor, were excluded following race-neutral explanations pertaining to matters other than their drug use views expressed during voir dire."  With respect to juror James, the appellate court found that her voir dire testimony was that drug use was a personal choice, while the comparative white jurors said it may be a personal choice but the law should be followed and applied.  For these reasons, the <u>Batson</u> claim was denied.  <u>State v. Trotter</u>, 852 So.2d at 1254-55.  The Supreme Court of Louisiana, over a dissenting vote from Justice Johnson, denied writs and reconsideration without comment. <u>State v. Trotter</u>, 867 So.2d 689 (La. 2004) and 870 So.2d 282 (La. 2004).

## B. <u>Batson</u> and <u>Miller-El</u> Principles

Under <u>Batson</u>, there is three-part process for evaluating claims that prosecutor used peremptory challenges in violation of equal protection clause: (1) the defendant must make

a prima facie showing that a peremptory challenge has been exercised on the basis of race, (2) if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question, and (3) in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination. <u>Miller-El v. Cockrell</u>, 123 S.Ct. 1029, 1035 (2003) (<u>Miller-El I</u>).

The Supreme Court has said that more powerful than bare statistics in analyzing a <u>Batson</u> claim "are side-by-side comparisons of some black venire panelists who were struck and white panelists allowed to serve." <u>Miller-El v. Dretke</u>, 125 S.Ct. 2317 (2005) (<u>Miller-El II</u>). The Court in <u>Miller-El II</u> granted habeas relief on a <u>Batson</u> claim because the State's given reasons for striking two black jurors were demonstrably undermined by the fact the State did not strike white panel members who gave similar responses.

The Fifth Circuit recently granted habeas relief based on a similar comparative analysis, after a detailed review of the <u>Miller-El</u> decisions. <u>Reed v. Quarterman</u>, 555 F.3d 364 (5th Cir. 2009). The <u>Reed</u> decision listed three principles that should guide such an analysis. First, the court does not need to compare jurors who exhibit all of the exact same characteristics. "If the State asserts that it struck a black juror with a particular characteristic, and it also accepted nonblack jurors with that same characteristic, this is evidence that the asserted justification was a pretext for discrimination, even if the two jurors are dissimilar in other respects." <u>Reed</u>, 555 F.3d at 376. "Second, if the State asserts that it was concerned about a particular characteristic but did not engage in meaningful voir dire examination on

that subject, then the State's failure to question the juror on that topic is some evidence that the asserted reason was a pretext for discrimination." Id. "Third, we must consider only the State's asserted reasons for striking the black jurors and compare those reasons with its treatment of the nonblack jurors." Id.

The Supreme Court recently reversed a conviction, on review of a direct appeal, after conducting a similar comparative analysis. Snyder v. Louisiana, 128 S.Ct. 1203 (2008). The Court acknowledged that, on appeal, a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous. Id. at 1207. The Court nonetheless reversed the conviction because the prosecutor's stated reasons for striking two black jurors did not pan out when compared to similar facts surrounding white panelists the prosecution did not strike. The analysis was also applied in recent Fifth Circuit decisions. See Hayes v. Thaler, 2010 WL 183395 (5th Cir. Jan. 19, 2010) (reversing trial court and granting habeas relief on a Batson claim after conducting comparative analysis) and Wade v. Cain, 2010 WL 1427372 (5th  Cir. Apr 9, 2010) (affirming denial of habeas after conducting comparative analysis).

## C. Analysis of the Batson Claims

### 1. Introduction

The Fifth Circuit stressed in Reed that the comparative analysis rests on the entire voir dire transcript, even when the petitioner does not explicitly point to particular voir dire. Petitioner did not do much in his appellate brief and habeas petition to develop a comparative

analysis, but he did a better job than the defendants in <u>Miller-El</u> and <u>Reed</u>, and the courts conducted a full comparative analysis in those cases and granted habeas relief.  Accordingly, this court has reviewed the entire voir dire transcript, pertinent portions of which are discussed below. That review shows that Petitioner's trial counsel, in the motion for new trial, did a good job (with one understandable mistake) of identifying the voir dire that is relevant to a comparative analysis.

### 2. Habeas Standard of Review

Petitioner seeks federal habeas relief following the Louisiana court's determination of fact that the State's race neutral explanations were true.  Under 28 U.S.C. § 2254(d)(2), Petitioner may obtain relief only by showing the Louisiana court's conclusion is "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  This court presumes the Louisiana court's factual findings to be sound unless Petitioner rebuts the "presumption of correctness by clear and convincing evidence." Section 2254(e)(1).  The standard is "demanding but not insatiable," and "deference does not by definition preclude relief."  <u>Miller-El</u>, 125 S.Ct. at 2325.

### 3. White Jurors Ms. Ratley and Ms. Connell

Petitioner argues that (1) the record does not support the reasons the prosecutor gave for exercising his strikes and (2) a comparison with answers given by prospective white jurors who the State did not strike provides further support for a <u>Batson</u> claim.  Petitioner points to answers by Ms. Connell, a white prospective juror who was eventually stricken by

the defense, and Ms. Ratley, a white juror who served on the trial jury.  Both answered

regarding their views of the drug laws and whether they had relatives with drug issues, both

of which were grounds the prosecutor cited for striking black jurors.

The prosecutor questioned each six-juror panel about their views on the drugs laws.

He stated that people disagree about whether the drug laws are good. He then asked whether

the prospective jurors agreed with the laws or thought they were good, or whether they

thought drug usage was a "personal choice."

The prosecutor asked Ms. Connell's panel: "How do you feel about the drug laws?

Are they okay as they are or is it a person's personal choice?" Ms. Connell answered:

> I believe it's a personal choice but I also do not want someone
> approaching my child and offering them drugs.  I believe if
> that's their choice that's fine, but it's a dangerous habit.

The prosecutor asked Ms. Connell if it would be difficult for her to enforce a law that she

personally believed should not be a law or should be changed.  Ms. Connell answered:

> I don't think it would be a problem because it is a law and as
> citizens we are required to follow the law.  It's a personal
> choice, but I still follow the law.

Tr. 230.

The prosecutor then looked to white juror Ms. Ratley.  She answered, "I believe it's

personal choice but the law should be upheld."  The prosecutor asked if Ms. Ratley, if she

were a legislator, would vote for more personal choice.  She answered, "No."  Ratley also

denied that she would have difficulty enforcing a law that she disagreed with.  Tr. 230.

The prosecutor later asked the jurors if they or a friend or family member had been arrested for a drug charge. Ms. Connell said that she had two cousins who had been arrested several times. Although she thought the court system "did a wonderful job," the system failed them as far as treatment because after release from custody both returned to drugs, and one was dealing.  Ms. Ratley volunteered that her stepson, three or four months earlier, was found with alcohol and marijuana.  The juvenile was going through a program designed to help him.  Neither Ms. Connell nor Ms. Ratley believed that their experiences would impact their ability to sit as an impartial juror in a drug trial.  Tr. 231-32.

### 4. Ms. Sudds

We now turn to the first of the three jurors who Petitioner claims were struck in violation of <u>Batson</u>. When the judge called on the prosecutor to give a race neutral explanation for his strikes, Ms. Sudds was the first juror named. The prosecutor said:

> Your Honor, on the record she stated that she felt drugs would be personal choice, which was an indication that she disagrees with current state law.  She stated that some of her friends had problems with drugs, narcotics in the past.

Defense counsel disagreed with the characterization of Ms. Sudds' answers.  The trial judge ruled: "Certainly doesn't give rise to a cause for challenge but it's a race neutral explanation for why the juror was excluded. That pre-emptory challenge will stand."  Tr. 293-94.

The transcript, which neither counsel nor the court had the advantage of at that time, shows that the prosecutor did pose the "personal choice" question to Ms. Sudds' panel. He said that he knew people who believed drug use was a personal choice, which he compared

to a decision to eat a fettuccine dish despite a doctor's warning that it was unhealthy.  He then asked the first juror, "[H]ow do you feel about the drug laws?  Should it be someone's personal choice?"  The first juror, a black man, said it was a personal choice, but the person should suffer the consequence of his choice.  Other prospective jurors said that the drug laws should be enforced.  Ms. Sudds was then asked:

> Q.  How do you feel about the drugs laws?  Do you feel its someone's personal choice, or how do you feel about it?
>
> A.  That's their choice if they break the law.  They should serve the time.
>
> Q.  Do you agree with the enforcement or do you think drug laws should be gotten rid of?  How do you feel towards the enforcement of the drug laws?
>
> A.  They should be enforced.

Tr. 185-88.

The prosecutor's first stated reason for striking Ms. Sudds was her answer to the "personal choice" question, which he interpreted as a statement that she disagreed with state law.  The record shows, however, that Ms. Sudds said it was a choice to break the law, but the person should then serve the time, and she made clear that she believed the current drug laws "should be enforced."  Thus, there is no record evidence to support the prosecutor's stated reason on this point.

Defense counsel later asked the prospective jurors if they or relatives had been drug addicts or had drugs disrupt their lives.  Ms. Sudds answered, "I have two uncles, still on

drugs, and a close neighbor, and it's hard." Counsel then asked how that experience would affect her role as a juror.  She responded:  "My uncles had a choice."  Tr. 203.  She also answered yes when defense counsel asked: "Even though you felt the pain over drugs you would give [Petitioner] the same benefit of doubt as you would any other defendant?" The prosecutor did not ask Ms. Sudds any questions about her relatives or their drug problems during his voir dire, although he was not afforded the opportunity to ask questions after defense counsel broached this issue. Tr. 203-04.

The prosecutor's second and final stated reason for striking Ms. Sudds was her statement that her friends had problems with drugs.  She did say that two uncles and a neighbor were on drugs, which she said was their choice.  She gave no indication that it would make her biased or sympathetic to the defense. Drug use by a friend or relative is a race neutral reason to strike a juror, but the prosecutor's assertion of this reason to strike Ms. Sudds is seriously undermined by the fact that (1) he did not strike white prospective jurors Connell (two cousins arrested for drugs several times) and Ratley (stepson with charges related to alcohol and marijuana) and (2) he did not ask Ms. Sudds' panel questions about friends or relatives with drug issues.

There is no record evidence to support the prosecutor's first stated reason to strike Ms. Sudds, and a comparative analysis seriously undermines the credibility of the second stated reason.  As in Miller-El II, Petitioner has satisfied his burden with respect to this prospective juror.  This court would have to ignore the comparative analysis to uphold the finding of no

discrimination.  Furthermore, there was no statement by the prosecutor or finding by the trial judge that would overcome the effect of that analysis.  As in <u>Miller-El</u>, a review of the entire voir dire and a comparison of how similarly situated black and white panel members were treated "supports a conclusion that race was significant in determining who was challenged and who was not." <u>Miller-El</u>, 125 S.Ct. at 2332.  Despite the presumption of correctness, the state court's finding that the prosecutor gave a credible race-neutral reason for striking Ms. Sudds was an unreasonable determination of the facts in light of the evidence presented.

### 5. Ms. James

The judge also asked the prosecutor to provide a race neutral reason for striking prospective juror Ms. James.  The extent of the prosecutor's response was: "When asked regarding the question of the current law or personal feelings regarding drugs, she indicated it was a personal choice."  Defense counsel disagreed that Ms. James (or any prospective jurors) suggested a belief that the drugs at issue should be legal.  Rather, they had said that if a person decides to use drugs it is a personal choice, yet the juror would uphold the law. The judge replied that his notes "indicate that Ms. James had difficulty with constructive possession."  He then said: "I find a race neutral explanation for Ms. James."  Tr. 295-96.

Ms. James did, as the trial judge noted, initially struggle a bit with the concept of constructive possession.  The prosecutor asked Ms. James what she believed the State had to prove to establish possession of drugs.  She first said, "Got to be on him."  She then conceded that drugs did not have to be on a defendant's person to equal possession, but she

could not explain another method of possession (despite the prosecutor earlier giving examples of means of constructive possession).  After a discussion about how Ms. James possessed her television set, even though it was in her home and not on her person, Ms. James indicated an understanding of the concept of constructive possession.  Tr. 244-45.

The prosecutor told Ms. James' panel that people have different opinions about the legality of drug sales.  He asked:  "Do you think the laws as written right now are good or do you think it should be someone's personal choice whether they want to do drugs?"  The first person asked, Mr. Miller, said, "Each man to his own," and added, "He's got a right to do what he wants to do."  The prosecutor then asked Ms. James how she felt.  She parroted Mr. Miller, answering: "I think each his own.  They can do whatever they like, I guess." Other jurors said they thought the laws were fair, good, or right.  Tr. 249-50.

The state court's finding of no race discrimination as to the striking of Ms. James was not an unreasonable determination of the facts.  The prosecutor's one stated reason for striking her was her indication of an opinion that drug usage is a personal choice.  Ms. James' answer in this area was likely influenced by the answer of the juror who spoke before her, but she did say, "I think each his own" and that people can do "whatever they like, I guess."  Ms. James, unlike the white Ms. Connell who gave a similar answer, was not asked whether she would enforce the law despite that belief.

Reasonable persons could perhaps debate whether Ms. James' answer indicated any unlikelihood on her part to serve as an impartial juror in a drug case, but her answer provided

a plausible basis for the State's claim of a race-neutral reason and support for the state court's related factual finding.  Considering the deference due the state court's factual findings, this court cannot say that the state court's finding of a race-neutral reason to strike Ms. James was so wrong as to be unreasonable.  The lack of a "rehabilitation" question to Ms. James, like the prosecutor asked Ms. Connell, somewhat supports the <u>Batson</u> claim, but the undersigned does not find that single fact sufficient to overcome the presumption of correctness of the state court's finding.

The trial judge added that Ms. James had difficulty with the concept of constructive possession, but only the reasons given by the prosecutor may be considered.  <u>Miller-El</u> explained:

> [W]hen illegitimate grounds like race are an issue, a prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives.  A <u>Batson</u> challenge does not call for a mere exercise in thinking up any rational basis.  If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false.

<u>Miller-El</u>, 125 S.Ct. at 2332.

### 6. Ms. (Alma) Taylor

The record is not clear as to the race of various jurors. The only way to determine a juror's race is based on the knowledge that (1) the State used all of its strikes on black jurors with the exception of Ms. Cole and (2) the defense used all of its strikes on white jurors. The actual process of making the strikes happened "at the bench" and was not transcribed. The

judge said that he gave his notes to the clerk for filing. Tr. 292. They offer some help. Tr. 59-
62. The notes do not state the race of any prospective juror, but they do list by first initial and
last name the prospective jurors struck by each side. One can also review the transcript where
the judge called on both counsel to give race-neutral reasons for each strike. Tr. 292-307.
That tells us the race of those stricken. It has also been represented by the defense that Ratley
and Connell are white, and the State has not challenged that assertion. The parties have not
pointed to any indication in the record of the race of the other jurors.

There were two Ms. Taylor's on the venire. One was Kim Taylor. Tr. 204. The judge's
notes reflect that the defense used its sixth strike on "K. Taylor." Tr. 59. The defense struck
only white jurors, so we know that Kim Taylor is white.

There was also an Alma Taylor. Tr. 221. The State struck an "A. Taylor" with its
fourth strike, so we know she is black.

The prosecutor was also called on to give a race neutral explanation for his strike of
prospective black juror Ms. (Alma) Taylor.  He responded:

> Your Honor, I believe Ms. Taylor also stated that consumption
> of drugs was a personal choice.  She also came up regarding
> reasonable doubt in her answers, I felt, indicated that she might
> hold reasonable doubt to a higher standard than it actually is.

Defense counsel stated that he did not have the same notations.  The judge added that Ms.
Taylor said her sister was addicted to drugs, which "could be a sufficient basis."  The judge
added that he realized that he was requiring both counsel to rely on their memories of the
earlier voir dire, with their actions to later be judged by a reviewing court with the benefit

of a transcript, so he shared his notes with both counsel.  The judge found: "I believe a race neutral reason exists for striking Ms. Taylor." Tr. 296-97.

Confusion creeps in here because both Alma Taylor and Kim Taylor simultaneously occupied the jury box for voir dire. The transcript describes the juror answering questions only as "Ms. Taylor." Fortunately, the mystery of which Ms. Taylor is speaking when can be solved.

The transcript indicates that 12 jurors were originally called to the box for voir dire. They were all sworn, but the questioning was then limited to the six prospective jurors on the front row. When the attorneys finished questioning the front six, those six were asked to step out of the jury box, the back row moved to the front, and six new names were called to fill the back row. The new front-six would then undergo voir dire. The court did not announce which jurors occupied which row when, but a careful review of the transcript shows that, after an initial 12 jurors, the rotation into the box of three new groups of six, and a lunch break, the front row included the white Kim Taylor. At the same time, the black Alma Taylor sat on the back row. The judge then told the lawyers to "proceed with the front row." Tr. 227.

When defense counsel filed his motion for new trial, he quoted the testimony that he thought came from the stricken black Ms. Taylor, but he mistakenly used the testimony of the white Kim Taylor. Tr. 80. He referred to the prosecutor's "personal choice" voir dire:

> Q.  As stated earlier different people have different views on the drug laws.  Ms. Taylor, how do you feel about the drug laws? Are they okay as they are or is it a person's personal choice?

> A.  I think it should be illegal to possess drugs.  I work in a drug
> rehabilitation clinic and help people who have problems with
> drug and alcoholism, but I strongly believe in enforcing the law.

Ms. (Kim) Taylor stated that her work with drug addicts would not make it difficult for her
to sit in this case.  Tr. 229.

It is evident from the record that the prospective juror who gave that answer was not
the stricken black Ms. Taylor.  Further evidence of this is found in defense counsel's
statement that he struck the white Ms. Taylor because he "felt Ms. Taylor working in a drug
rehab facility may influence her deliberations in this case." Tr. 299.

The voir dire of Ms. Alma Taylor, the black prospective juror, begins at Tr. 242, when
her group of six took the front row.  The prosecutor questioned prospective jurors on what
they thought the State must prove to establish possession of over 28 grams of cocaine.  Ms.
Taylor, the third juror in her group to be asked the question, said: "That he was in possession
of it, and you have to prove it with reasonable doubt."  Tr. 245.  The prosecutor then began
discussing reasonable doubt and posed to Ms. Taylor a "hypothet" that he would show her
a birth certificate, driver's license, passport, and other documents that all said he was born
on February 25, 1971.  He asked Ms. Taylor if he had thereby proven to her that he was born
on that date. Ms. Taylor answered, "Yes."  When asked if she was sure, Ms. Taylor said,
"The documents indicate so."  The prosecutor then pressed as to whether Ms. Taylor was
"absolutely sure," and she said that she was.  The prosecutor then suggested that a person
would have to have been present at his birth to be absolutely sure.  He explained that such

absolute certainty is not required for a conviction.  Rather, juries convict based on the "reasonable doubt" standard.  Ms. Taylor agreed with him that the reasonable doubt standard applied.  Tr. 245-46.

The prosecutor then discussed with Ms. Taylor the means of establishing possession. None of her answers to those questions were cited as a race-neutral reason for striking her. The prosecutor then questioned other prospective jurors before returning to the question: "Do you think the laws as written right now are good or do you think it should be someone's personal choice whether they want to do drugs?"  The first two jurors answered, in effect, to each his own.  Ms. Taylor departed from that answer and said, "I think the law are fair." Tr. 249-50.  Ms. Taylor was not questioned by the prosecutor again, except to ask about her hobby of cooking.  She said that her best dishes include mustard greens and soul food.  Tr. 250-51.

Defense counsel also questioned the group.  He asked them if they would consider it a very important job if asked to serve on the jury.  Ms. Taylor answered:

> It's important to listen to the facts.  It's important because someone's freedom on the line, and if I'm responsible for it I want to be able to be attentive, to know and understand what is going on.

Tr. 253.  Defense counsel also asked Ms. Taylor if she thought she should be found guilty of drug possession if a fellow juror, unbeknownst to her, put drugs in her purse.  Ms. Taylor's answer indicated her understanding of the "knowing" possession element of the crime.  Tr. 256.

The prosecutor's first stated reason for striking Ms. Taylor was his assertion that she said that "consumption of drugs was a personal choice." A review of the transcript reveals no such comment by Ms. Taylor. Her only reply to the question in this area was that the drug laws "are fair." There was no factual basis for the state court to find credible this stated reason for the strike.

The prosecutor's second stated reason for striking Ms. Taylor was that "her answers, I felt, indicated that she might hold reasonable doubt to a higher standard than it actually is." The above review of the voir dire reveals no support for the claim that Ms. Taylor would hold the prosecution to a higher standard.  She mentioned the reasonable doubt standard in an answer without being prompted, was willing to accept the prosecutor's hypothetical submissions of documents as adequate proof of birth date, and agreed that the proper standard for the jury was beyond a reasonable doubt. She was even willing to accept the prosecutor's documents as enough evidence to make her, in the prosecutor's words, "absolutely sure" of the birth date. Ms. Taylor never suggested, however, that she would hold the State to that burden or any burden other than beyond a reasonable doubt. Thus, the record contains no evidence to support the prosecutor's second claimed reason for striking Ms. Taylor.

The trial judge added his recollection that Ms. Taylor said her sister was addicted to drugs, but the transcript does not support that recollection. Even so, Miller-El II states that the reasons stated by the prosecutor must stand on their own merit.  Neither the trial judge

nor an appeals court may assist the prosecutor by coming up with race-neutral reasons that the prosecutor did not himself articulate. Considering the lack of record evidence to support either of the prosecutor's stated reasons for striking Ms. Taylor, and the Batson and Miller-El precedents and framework, the undersigned finds the state court's conclusion to be an unreasonable determination of the facts in light of the evidence presented.

**Conclusion**

The findings with respect to the strikes of prospective black jurors Ms. Taylor and Ms. Sudds have established a Batson violation. A finding of Batson error with respect to only one juror would require relief from the conviction.   Snyder v. Louisiana, 128 S.Ct. at 1208. Accordingly, Petitioner is entitled to habeas relief on the claim.  The court need not reach the other claims raised by Petitioner.  The appropriate relief is to grant the writ, set aside the conviction and sentence, and order Petitioner's release from custody on this conviction unless the State grants Petitioner a new trial within 120 days from the date of any order of the district court that adopts this recommendation.  See Reed, 555 F.3d at 382-83.

Accordingly,

**IT IS RECOMMENDED** that the petition for writ of habeas corpus be **granted** by setting aside Petitioner's conviction and related enhanced sentence for possession of Schedule II CDS (cocaine) and ordering that Petitioner be released from custody based on that conviction and sentence unless the State grants him a new trial within 120 days from the date of an order of the district court that adopts this recommendation.

**Objections**

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b).  A party may respond to another party's objections within seven (7) days after being served with a copy thereof.  Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 14 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED in Shreveport, Louisiana, this 27th day of April, 2010.

MARK L. HORNSBY
UNITED STATES MAGISTRATE JUDGE